FILED
IN CLERKS OFFICE

2023 MAR -3  PM 12: 57

U.S. DISTRICT COURT
DISTRICT OF MASS.

# CLASS ACTION LAW SUIT AGAINST THE

# UNITED STATES

# ENVIRONMENTAL PROTECTION AGENCY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLASS ACTION SUIT            )
JOE ROBINSON                 )
Lead Plaintiff               )
                             )
        V.                   )                          :
                             )
U.S. ENVIRONMENTAL           )
PROTECTION AGENCY            )    No._____
            and              )
MICHAEL S. REGAN             )
ADMINISTRATOR, U.S.          )
ENVIRONMENTAL PROTECTION)
AGENCY, in his official capacity.   )

Respondent

## REQUEST FOR ADJUDICATION ON THREE COMPLAINTS

### BACKGROUND TO THE FIRST COMPLAINT

In the year 2010 the Volkswagen Automobile Company (hereinafter "VW") began selling turbocharged diesel cars in the United States. VW knew that there is an EPA regulation limiting the quantity of nitrogen oxides that may be emitted by a diesel car per mile of driving.

The regulation number is EPA Regulation **§ 86.1811–04 Emission standards for light-duty vehicles,..., 40 C.F.R. § 86.1811–04.**

VW assumed incorrectly that these diesel cars would not meet the regulation's emissions requirements without some chemical treatment being applied to the exhaust gases after the gases would leave the engine but prior to their being tested on the gas analyzing equipment.

1

Therefore VW installed on each of their diesel cars an alleged nitrogen oxide reducing system called AdBlue. The function of this AdBlue system was to spray a chemistry onto the exhaust gases after they left the engine but prior to their being tested on the gas analyzing equipment that would allegedly enable the car to be in compliance with the subject regulation.

|In 1992, I, the lead plaintiff in this litigation, who has no financial interest in any energy company, was granted U.S. Patent 5085841 (Appendix A) which teaches the only known way to reduce nitrogen oxides and carbon particles simultaneously from diesel combustion. With this expertise in reducing nitrogen oxides from diesel combustion I recognized that the AdBlue was incapable of reducing nitrogen oxides and therefore incapable of being a pollution control system. The entire auto industry was ignorant of the attached chemistry (Appendix B) that explains how the turbocharger was the real pollution control system that kept all of the VW's diesel cars in compliance with the regulation.|

Since all pollution control systems must perform their function for a minimum of 50,000 miles without any servicing during those 50,000 miles, it meant that each car would have to carry enough of the AdBlue chemistry to last 50,000 miles.

A container that would carry that much material would be bigger than the size of the vehicle. In order to carry a much smaller quantity, the car's computer would only dispense the AdBlue material when the car's computer recognized that the vehicle was being tested on EPA's Federal Test Procedure for nitrogen oxide emissions. According to the regulation EPA's Federal Test Procedure is the only test that can determine compliance.

Obviously if the AdBlue were a legitimate pollution control system this would be tampering and cheating. The fact is that the AdBlue is not a pollution control system, and cannot be a pollution control system because it cannot reduce nitrogen oxides, the subject pollutant.

The most important paragraph in the regulation is the paragraph numbered (5), (b), (4), (c) which appears on Page 2 of said regulation and reads as follows:

"Exhaust emissions from Tier 2 vehicles must not exceed the standards in Table S04–2 of this section at intermediate useful life, if applicable, when tested over the FTP (Federal Test Procedure)."

This is the most important three lines in the regulation because it states clearly that the EPA's Federal Test Procedure is the only test that can determine if a vehicle is in compliance - or is not in compliance - with the regulation. The EPA's Federal Test Procedure is objective and repeatable and most important because the regulation - as in all EPA regulations limiting pollutants from vehicles - states that the EPA test is the only test that can determine compliance.

Since the EPA had written the regulation, it was quite aware of this paragraph and between 2010 and 2014 the EPA tested a number of VW's diesel vehicles on its Federal Test Procedure without administering any of the AdBlue, and much to its surprise, all of the vehicles were in compliance with the regulation.

Because a diesel vehicle will give its driver 30% more miles per gallon than its gasoline equivalent and because the EPA has done everything in its power to prevent significant fuel savings, the EPA hid this data from VW and from the Federal District Courts in San Francisco, California and Detroit, Michigan.

3

In 2014 - in order to create false data with which to deceive the Courts and VW - the EPA had the West Virginia Institute take a VW diesel car and drive it up the 4,000 foot high Mount Baldy in California and measure the nitrogen oxides that were being emitted. (The West Virginia Research is 139 pages long and is available upon request by email.)

When the EPA test is being administered to a vehicle, the vehicle simulates absolute level road driving. We all know that driving one mile up a mountain will require a lot more fuel than when driving one mile on a level road.

Since the engine always burns the fuel in the same volume inside the combustion chamber, when you pump more fuel into the combustion chambers because you are driving up a mountain, the temperatures in the flame zone will be a lot hotter than when you drive at the same speed on a level road.

The temperature in the flame zone of the combustion chambers performs two functions. First of all, the temperature is the sole ingredient that determines the pressure on the piston and therefore it is the temperature, and only the temperature, that determines how much work the engine is producing at any particular moment. We learned this from the Laws of Gases which were taught to us by Boyle, Charles and Gay-Lessac.

Second, as long as the temperature in the flame zone is below 2,800 degrees Farenheit nitrogen oxides will not be produced. The higher that the temperatures go above 2,800 degrees Farenheit the more nitrogen oxides will be produced. Since the temperatures in the combustion chamber are much higher when driving up a mountain, the nitrogen oxide emissions from the Western Virginia Institute driving up a 4,000 foot mountain are going to be enormously greater than the nitrogen oxide emissions when driving at the same speed on a level road or on EPA's simulated level road test.

## DESCRIPTION OF THE FIRST ILLEGAL ACTIVITY ENGAGED IN BY THE EPA

The EPA then deceived VW and the two Federal Courts by presenting to them the West Virginia data as if it were legitimate evidence, which, of course, it wasn't.

On 19 December 2018 I requested from the Department of Justice to email to me a copy of the EPA's Federal Test Procedure test data showing that any of the Volkswagen diesel vehicles were out of compliance when the AdBlue - the alleged pollution control device - was not administered. On that same 19 December 2018 Attorney Blackwell responded as follows:

"Mr. Robinson,
Thank you for your email. I am not able to provide to you information that is not publicly available. That information is not publicly available.
Thank you.
*Jennifer Leigh Blackwell
Senior Trial Attorney
Environmental Crimes Section
Department of Justice
(202) 305-0360
Jennifer.blackwell2@usdoj.gov"

If the information is not publicly available then it is not evidence. Therefore there is no evidence of any VW car being out of compliance when the AdBlue was not administered. Therefore there is no evidence that AdBlue is a pollution control system. Therefore there is no evidence of tampering or cheating.

In other words, the EPA knew as early as 2014 - two years before the case came to court - that every single diesel car that VW sold in the United States was in compliance with the regulation without any AdBlue being administered. The decisions handed down by the two Federal Courts of tampering and cheating with a pollution control system are without foundation because the AdBlue is not a pollution control system.

5

**The fact that Volkswagen's executives were ignorant of their innocence does not make them guilty.**

Three questions pop up immediately. Why didn't VW's lawyers, Sullivan & Cromwell stop the litigation in its tracks by asking for the EPA's Federal Test Procedure data in 2016, as I requested in 2018?

And why didn't Judge Charles Breyer in the San Francisco Federal Court stop the litigation in its tracks by asking for the EPA's Federal Test Procedure data, as I requested in 2018? And why didn't Judge Sean Cox in the Detroit Federal Court stop the litigation in its tracks by asking for the EPA's Federal Test Procedure data, as I requested in 2018?

As this Court well knows, the requirement of every legitimate adjudication is that the adjudication must be consistent with the wording of the law, or as in this case, with the wording of the regulation. We can only assume that the San Francisco and Detroit Federal Courts were negligent by not reading even page 2 of the regulation to make absolutely sure that their adjudications were consistent with the wording of the regulation.

DESCRIPTION OF THE SECOND ILLEGAL ACTIVITY ENGAGED IN BY THE EPA

Sullivan & Cromwell's actions were not a result of negligence. They were the result of the firm's decision to engage in wrongdoing.

In May 2016, shortly after VW chose Sullivan & Cromwell to defend them, I spoke with - and sent a confirming email to - Attorney Robert Giuffra of Sullivan & Cromwell, the attorney in charge of the litigation - offering my services as an expert to help defend VW.

Sullivan and Cromwell chose not to use any expert to defend VW nor did Sullivan & Cromwell mention to VW that there is no evidence of VW committing any crime. Sullivan & Cromwell chose to collude with the EPA to convince VW to confess to a crime that had never been committed.

Colluding with defense attorneys to convince VW to confess to a crime that was never committed is EPA's second illegal activity in this litigation.

## DESCRIPTION OF THE THIRD ILLEGAL ACTIVITY ENGAGED IN BY THE EPA

The EPA may have engaged in an additional illegal activity in this case. In its 1977 case, Lubrizol v. the EPA (Appendix C), the DC Appeals Court ordered the EPA that in all of EPA's litigations, in any request for adjudication, the evidence must be consistent with the wording of the law or, as in this case, with the wording of the regulation.

•Requesting the Federal Courts to adjudicate on the West Virginia data is not a request for an adjudication that is consistent with the wording of the regulation, nor is it consistent with the adjudication made by the DC Appeals Court in 1977. Is this not a Contempt of Court that the EPA totally ignores this Court Order handed down directly to the EPA by the DC Appeals Court?

## MOTIVES OF THE EPA TO ENGAGE IN THESE ILLEGAL ACTIVITIES

In order to understand the motive behind the EPA's engaging in this illegal behavior, one need only look at the EPA's history. Historically, the EPA appears to be the vanguard of the oil and gas interests and the Japanese automakers as far back as 1974, despite the fact that the EPA has the mandate to reduce fuel consumption.

## AN EXAMPLE OF EPA'S HYPOCRISY AND PERFIDY

The EPA issued regulations that require the electricity producing companies to stop burning coal to produce electricity and to burn natural gas instead. This created the biggest source of air pollution that we have in the United States. The burning of natural gas to produce electricity emits 380 million tons of nitrogen oxides every year in America. Let's not forget that nitrogen oxides are the subject pollutant in these litigations.

If 100 million automobiles in the United States (70% of the total) were diesel with no limitation on nitrogen oxide emissions, their total nitrogen oxide emissions would be less than 1% of the nitrogen oxide emissions because the EPA has the electric companies producing so much of our electricity from natural gas instead of coal. Later in this complaint I will explain why coal emissions are so much cleaner than natural gas emissions.

According to the EPA, it is perfectly okay to be the biggest emitter of air pollution with the 380 million tons of nitrogen oxides that are emitted by the electric companies when they produce electricity from natural gas, provided that you are consuming products supplied by the oil and gas industry. But since diesel cars reduce fuel consumption by 30% when compared to their gasoline equivalents, it is not okay to emit less than 1% of that amount of nitrogen oxides if you are reducing the consumption of products supplied by the oil and gas industry.

**Tennessee Williams put it best: "There is nothing stronger than the stench of hypocrisy."**

This is nothing new for the EPA. In 1974 Dr. Victor Wouk (Doctor of Electrical Engineering from Stanford University) bought a Buick Skylark that he brought to the EPA to be tested to determine its miles per gallon and pollution per mile prior to any modification.

8

After the EPA supplied the miles per gallon and pollution per mile data prior to any modification, Dr. Wouk modified the vehicle into being a hybrid automobile. In 1974 Dr. Wouk was the real inventor of the hybrid car.

After the modification, Dr. Wouk then brought his Buick Skylark hybrid back to the EPA for testing. This new data showed that the hybrid doubled miles per gallon while cutting pollution in half compared to the original design. (Appendix D)

The EPA then killed the hybrid in order to stop a major source of fuel savings. This would lead to the eventual bankruptcy of the American auto making industry.

You may remember that in that year, 1974, we experienced the first fake oil shortages. This was the incentive for drivers to buy higher gas mileage cars. Since the drivers did not have American made hybrids, they purchased Japanese imports.

In 1975 10% of the new cars sold in America were imports. Five years later, in 1980, 35% of the new cars sold in America were imports, primarily Japanese. This would lead to the eventual bankruptcy of General Motors and Chrysler and the near bankruptcy of Ford.

As I wrote earlier, contrary to its mandate to reduce fuel consumption, the EPA's actions are the actions of the vanguard of the oil and gas interests and the Japanese automakers. Now we understand why the EPA felt the need to engage in the illegal activity of hiding from VW and the two Federal Courts that there was no evidence of tampering or cheating. Diesel cars consume 30% less fuel when compared to their gasoline equivalents and the EPA constantly engages in the illegal activity of doing everything in its power to prevent fuel savings. The EPA's preventing fuel savings is an illegal activity because the EPA has the  mandate to reduce fuel consumption.

Besides the fact that a VW executive named Oliver Schmidt has spent the last five years in Federal Prison in Milan, Michigan for a crime that was never committed, these travesties of justice have denied the American driver the 30% fuel savings that a diesel vehicle gives its driver in comparison to its gasoline equivalent.

REQUEST FOR ADJUDICATION ON THE FIRST COMPLAINT

This is a class action lawsuit of which I am the lead plaintiff. The clock cannot be turned back and there is no practical way of compensating me and the other 150 million drivers. Therefore our request is that the EPA be forfeited its right to regulate the emissions from 4 wheel diesel road vehicles. As I explained above, this court order will not materially alter nitrogen oxide emissions in the United States. The importance of taking away the EPA's right to regulate such emissions will remove the fear that every car maker has today of trying to sell diesel cars in America.

The Court should consider some reasonable punishment for the EPA and for the partners of Sullivan & Cromwell for participating in this deceit of the two Federal Courts.

BACKGROUND TO THE SECOND COMPLAINT

Permit me to explain why the emissions from burning coal to produce electricity are so much cleaner than the emissions from burning natural gas.

Coal burning boilers that produce electricity operate at 2,500 degrees Farenheit.

But natural gas boilers that produce electricity operate at 3,000 degrees Farenheit.

Since the pollutant nitrogen oxides are only produced at or above 2,800 degrees Farenheit, we get 380 million tons of nitrogen oxide pollution when we produce electricity from natural gas but we do not get any nitrogen oxides when we burn coal.

It is true that we would get sulfur dioxide when we burn coal but it is also true that we have known since 1978 that sulfur dioxide is totally harmless.

It is true that the EPA has been claiming since 1969 that sulfur dioxide is a pollutant with no evidence to support the claim. In fact the EPA learned in 1978 - as we all learned in 1978 - that sulfur dioxide is totally harmless because in 1978 Professor Herbert Schimmel of the Albert Einstein Medical School published his 14 years of research which proved that sulfur dioxide is totally harmless.

The EPA was aware of this research as soon as it was published. Without any evidence to the contrary, the EPA continues to insist that sulfur dioxide is a pollutant. (The 58 pages of Professor Schimmel's research proving that sulfur dioxide is harmless are available upon request by email.)

DESCRIPTION OF THE FOURTH ILLEGAL ACTIVITY ENGAGED IN BY THE EPA

By claiming falsely that sulfur dioxide is a pollutant, the EPA requires the oil refineries to limit the sulfur content in diesel fuel to 15 parts per million. This has raised the cost of diesel fuel enormously which in turn has raised the cost of every product that we buy. because every product that we buy is transported by diesel fuel.

Since diesel fuel and home heating oil are the same product, this has also raised the cost of heating homes and businesses enormously with no justification.

Diesel fuel - which is also home heating oil - is a less refined product than gasoline and a gallon of diesel fuel should cost a lot less than a gallon of gasoline. Because of this unjustified requirement of not more than 15 parts per million, every product that we buy and the heating oil that we use to heat buildings are far more expensive than they should be.

You may remember that before the EPA issued this regulation which limits the sulfur content in diesel fuel, a gallon of diesel fuel and home heating oil did cost less that a gallon of gasoline.

Here again I am the lead plaintiff of over 300 million plaintiffs who purchase goods and who heat their homes and businesses with oil.

REQUEST FOR ADJUDICATION ON THE SECOND COMPLAINT

Here again, the clock cannot be turned back and the plaintiffs cannot be remunerated for their multi-billion dollar losses. Therefore we the plaintiffs are requesting that the Court require the EPA to remove sulfur dioxide from its pollutant list and deny the EPA the right to limit the sulfur content in diesel fuel and home heating fuel.

REQUEST FOR ADJUDICATION ON THE THIRD COMPLAINT

Since sulfur dioxide is not a pollutant, we request that the Court order that EPA's regulations require that coal be the fuel of choice to produce electricity - and not natural gas - so that we can eliminate our biggest air pollutant, nitrogen oxides.

## AN ADDITIONAL CREDENTIAL FROM YOUR COURT OF THE LEAD PLAINTIFF

Attached is a 1984 Memorandum and Order handed down by Judge Walter Jay Skinner of your Court which confirms the expertise in the chemistry of combustion and the veracity of the lead plaintiff's statements.

Over the 35 year period - 1979 to 2014 - the lead plaintiff invented and marketed an automotive accessory called the "Gasaver."

The Gasaver added an effective but economic quantity of platinum to the air-fuel mixture entering the combustion chambers of an engine. The platinum enabled a much higher percentage of each gallon of fuel to burn inside the engine rather than that fuel being burnt only when it came in contact with the platinum inside the catalytic-converter-muffler.

Obviously, when you burn a higher percentage of each gallon of fuel inside the engine, you won't need as many gallons to drive the same distance.

The main claim in the Gasaver's advertising was "15 to 30% more miles per gallon."

In November 1980 the Administrative Law Court of the Consumer Protection Division of the U.S. Postal Service initiated a litigation challenging this advertising claim.

·Your Court was the Court of Appeals and as you can see from Judge Skinner's Memorandum and Order, which makes reference to Judge Joseph Tauro's prior remand for a de novo hearing and Judge Skinner's own preliminary injunction, there was no evidence to justify the accusations of the Postal Service.

Dated March 1, 2023          Respectfully Submitted

*[signature]*

Joe Robinson, Lead Plaintiff
136 Coolidge Street
Brookline, MA 02446
TEL: 1-617-734-9900
FAX: 1-617-203-9098
Email: joerobnson@gmail.com

Appendix A: U.S. Patent 5085841 (1992)
Appendix B: Diesel Combustion Chemistry which explains how the turbochargers were the real pollution control system.
Appendix C. DC Appeals Court Decision: Lubrizol v. EPA (1977)
Appendix D. Description of Victor Wouk's Hybrid Car (1974)
Judge Walter Jay Skinner's 1984 Memorandum & Order concerning the lead plaintiff

1 March 2023

TO: Clerk
UNITED STATES DISTRICT COURT
for the DISTRICT OF MASSACHUSETTS
1 COURTHOUSE WAY
BOSTON, MASSACHUSETTS 02210
TEL: 1-617-748-9152

FROM: B. Joel Robinson, Lead Plaintiff
136 Coolidge Street
Brookline, MA 02445
TEL: 1-617-734-9900

Email: joerobnson@gmail.com

## CERTIFICATE OF SERVICE

I affirm that I have sent a copy of this cover letter to

U.S. Environmental Protection Agency
and
Michael S. Regan, Administrator
U.S. Environmental Protection Agency in his official capacity.
Ronald Reagan Building, Rm. M1200
1300 Pennsylvania Ave., NW
Washington, DC 20460

Signed:
Joe Robinson

DATE: 1 March 2023

## TABLE OF CONTENTS

Page 1.   Request for Adjudication
          Background to the First Complaint

Page 5.   Description of the First Illegal Activity Engaged in by the EPA

Page 6.   Description of the Second Illegal Activity Engaged in by the EPA

Page 7.   Description of the Third Illegal Activity Engaged in by the EPA
          Motives of the EPA to engage in These Illegal Activities

Page 8.   An example of EPA's Hypocrisy and Perfidy

Page 10.  Request for Adjudication on the First Complaint
          Background to the Second Complaint

Page 11.  Description of the Fourth Illegal Activity Engaged in by the EPA

Page 12.  Request for Adjudication on the Second Complaint
          Request for Adjudication on the Third Complaint

Page 13.  Additional credential of the lead plaintiff from your Court

Appendix A. Lead Plaintiff's U.S. Patent 5085841

Appendix B. Combustion Chemistry of Diesel Fuel Explaining How the
            Turbochargers Were the real Pollution Control System

Appendix C. 1977 DC Appeals Court Decision: Lubrizol v. EPA

Appendix D. Description of Victor Wouk's inventing the Hybrid Car and
            the EPA Killing the Idea after the EPA Proved that the
            Hybrid Doubles Miles per Gallon and Cuts Pollution in Half.